FILED

2011 Jan-19  AM 08:09
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **MICHELLE HICKS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. CV-10-S-01401-NE** |
| | ) | |
| **AMERICAN UNITED LIFE** | ) | |
| **INSURANCE, CO.;** | ) | |
| **COLLATERAL BENEFITS** | ) | |
| **GROUP, LLC; and DISABILITY** | ) | |
| **REINSURANCE MANAGEMENT** | ) | |
| **SERVICES, INC.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

Plaintiff, Michelle Hicks, originally filed this action in the Circuit Court for Morgan County, Alabama.[1]  Defendants — *i.e.*, American United Life Insurance Company ("American United"), Collateral Benefits Group, LLC ("Collateral Benefits"), and Disability Reinsurance Management Services, Inc. ("DRMS") — removed the case to this court pursuant to 28 U.S.C. § 1441.[2]  Defendants base the court's jurisdiction on the federal question doctrine, asserting that plaintiff's claims fall within the ambit of the Employee Retirement Income Security Act of 1974

---

[1] Doc. no. 1, Exhibit A (Plaintiff's Complaint).

[2] Doc. no. 1, at 1-13 (Defendants' Notice of Removal).

("ERISA").  *See* 29 U.S.C. § 1001 *et seq.*; 28 U.S.C. § 1331.  The case is now before the court on the following motions:  (1) plaintiff's motion to remand;[3] (2) defendants' motions to dismiss plaintiff's state law claims, all claims for extracontractual and punitive damages, and to strike plaintiff's jury demand;[4] (3) plaintiff's motion for jurisdictional discovery and for an extension of time to file a response to defendants' motions to dismiss;[5] and (4) defendants' motions to compel arbitration and stay proceedings.[6]

## I.  SUMMARY OF THE RELEVANT FACTS

Plaintiff was employed by the Cullman County Board of Education as a teacher at Parkside Elementary School prior to the filing of this action.[7]  During that time, she was also a member of the Alabama Education Association ("AEA"), an organization with over 104,000 members, which consist of teachers, retired teachers, and education

---

[3]  Doc. no. 12.

[4]  Docs. no. 4, 6.

[5]  Doc. no. 9.  Plaintiff has already filed a response to defendants' motions to dismiss, and the aspect of plaintiff's motion seeking an extension of time to respond is, therefore, due to be denied.  *See* doc. no. 14, at 19-20.  Furthermore, the court is satisfied that the parties have submitted sufficient evidence upon which the court can properly determine whether subject matter jurisdiction exists in this action.  Indeed, in her motion to remand, plaintiff claims that she has provided "ample support" for her position, and that the evidence she has submitted is "overwhelming."  Doc. no. 14, at 8, 12.  Thus, the aspect of plaintiff's motion seeking  jurisdictional discovery, which is opposed by defendants American United and DRMS, *see* doc. no. 11, is also due to be denied.

[6] Docs. no. 18, 20.

[7] Doc. no. 1, Exhibit A, ¶¶ 1,5; doc. no. 4, at 2.

2

support personnel.[8]  As a teacher and member of the AEA, plaintiff was eligible for

certain benefits.  She alleges that defendant Collateral Benefits, acting as an agent on

behalf of the other defendants, contacted her about procuring a disability insurance

policy.[9]  She purchased a policy that was issued by defendant American United,

managed by defendant DRMS, and strongly endorsed by the AEA.[10]

Plaintiff allegedly maintained her coverage under the plan, which she claims

had an effective date of October 1, 2003.[11]  During the months leading up to and

including the month of October 2007, plaintiff suffered from a movement disorder

that caused sporadic and severe episodes, which left plaintiff fatigued for hours.[12]

According to plaintiff, the frequency of those episodes left her unable to work and

eventually resulted in her total disability.[13]  Defendants American United and DRMS

purportedly denied plaintiff's claim for disability benefits under the policy she

---

[8] Doc. no. 15, Exhibit A, at 1-2; *see also Alabama Education Association v. Black*, 752 So. 2d 514, 516 (Ala. Civ. App. 1999) (noting that "[t]he AEA is an organization consisting of . . . teachers, retired teachers, and education support personnel").

[9] Doc. no. 1, Exhibit A, ¶ 3.

[10] *Id.*, ¶¶ 2, 4, 6-7 (stating, among other things, that the AEA endorsed the subject policies); docs. no. 4, 6; *see also* doc. 19, Exhibit 5 (Letter from AEA Executive Paul Hubbert Explaining the AEA's Endorsement of American United's Disability Policy); doc. no. 1, Exhibit B (Acknowledge of Plaintiff's Enrollment in Benefit Plan and Terms).

[11] Doc. no. 1, Exhibit A, ¶ 11.

[12] *Id.*, ¶¶ 13-16, 21-22, 25-26 (claiming that plaintiff suffers from, among other things, celiac disease; dystonia; myclonus; and paroxysmal non-kinesigenic dyskinesias).

[13] *Id.*

purchased through defendant Collateral Benefits.[14]

Thereafter, plaintiff filed this action seeking relief from the denial of her insurance claim.  She alleges breach of contract and bad faith claims against defendants American United and DRMS.  She further asserts against defendant Collateral Benefits the claims of negligent and/or wanton failure to procure insurance coverage; fraud and misrepresentation; suppression; and deceit.[15]

## II.  DISCUSSION

### A.    Plaintiff's Motion to Remand

Plaintiff contends that the court lacks subject matter jurisdiction over this action, and that her motion to remand is, therefore, due to be granted.  In response, defendants assert that the court has jurisdiction because a federal question is at issue. 28 U.S.C. § 1331.  The Eleventh Circuit Court of Appeals has succinctly summarized the parameters of federal question jurisdiction:

> Under the federal question jurisdiction statute, 28 U.S.C. § 1331, a district court has subject matter jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States." Whether a claim arises under federal law for the purposes of 28 U.S.C. § 1331 is generally determined by the well-pleaded complaint rule, "which provides that federal jurisdiction exists only when a federal

---

[14] *Id.*, ¶ 23; doc. no. 4, at 1-3; doc. no. 6, at 1-2.

[15] Doc. no. 1, Exhibit A.

> question is presented on the face of the plaintiff's properly pleaded complaint." *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 392 (1987). A well-pleaded complaint presents a federal question where it "establishes either that federal law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law." *Franchise Tax Bd. v. Construction Laborers Vacation Trust for S. Cal.*, 463 U.S. 1, 27-28 (1983).

*Smith v. GTE Corp.*, 236 F.3d 1292, 1310 (11th Cir. 2001). The Supreme Court has observed that, "[t]o remove a case as one falling within federal-question jurisdiction, the federal question ordinarily must appear on the face of a properly pleaded complaint; an anticipated or actual federal defense generally does not qualify a case for removal." *Jefferson County v. Acker*, 527 U.S. 423, 430-31 (1999).

An important exception has developed as a corollary to the well-pleaded complaint rule, however: "Congress may so completely pre-empt a particular area [of the law] that any civil complaint raising this select group of claims is necessarily federal in character." *Metropolitan Life Insurance Co. v. Taylor*, 481 U.S. 58, 63-64 (1987). This is known as the "complete preemption doctrine," and it comes into play when "the pre-emptive force of a statute is so 'extraordinary' that it 'converts an ordinary state common-law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule.'" *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 392 (1987) (quoting *Taylor*, 481 U.S. at 65). The complete preemption doctrine has been

5

applied frequently to claims falling within the purview of ERISA.  *See*, *e.g.*, *Taylor*, 481 U.S. at 60; *BLAB T.V. of Mobile, Inc. v. Comcast Cable Communications, Inc.*, 182 F.3d 851, 855 (11th Cir. 1999).  In their notice of removal, defendants contend that the complete preemption doctrine applies in this action and the court, therefore, is properly vested with subject matter jurisdiction.

"A removing defendant bears the burden of proving proper federal jurisdiction." *Adventure Outdoors, Inc. v. Bloomberg*, 552 F.3d 1290, 1294 (11th Cir. 2008) (citing *Leonard v. Enterprise Rent-a-Car*, 279 F.3d 967, 972 (11th Cir. 2002)). "Because removal jurisdiction raises significant federalism concerns, federal courts are directed to construe removal statutes strictly.  Indeed, all doubts about jurisdiction should be resolved in favor of remand to state court." *University of South Alabama v. American Tobacco Co.*, 168 F.3d 405, 411 (11th Cir. 1999) (citations omitted).

In order for the complete preemption doctrine to apply, there must be a "relevant ERISA plan." *Butero v. Royal Maccabees Life Insurance Co.*, 174 F.3d 1207, 1212 (11th Cir. 1999).  In other words, the plan at issue must fall within the ambit of ERISA.  The question of whether the parties' plan is such a plan is the primary focus of the parties' dispute in the present action.  Plaintiff asserts that her claims are not governed by ERISA, and defendants argue otherwise.

1.    **Overview of ERISA**

A brief overview of ERISA will be helpful to the court's discussion of the issues presented in the various motions presently before the court.  Congress enacted ERISA to defend "the interests of participants in employee benefit plans and their beneficiaries."  29 U.S.C. § 1001(b).

> In passing ERISA, Congress's purpose was twofold:  to protect employees and to protect employers.  *See McMahon v. Digital Equipment Corp.*, 162 F.3d 28, 35-36 (1st Cir. 1998).  Congress wanted to safeguard employee interests by reducing the threat of abuse or mismanagement of funds that had been accumulated to finance employee benefits, *see Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 15 (1987), while at the same time safeguarding employer interests by eliminating "the threat of conflicting and inconsistent State and local regulation" of employee benefit plans, *New York State Conference of Blue Cross & Blue Shield v. Travelers Insurance Co.*, 514 U.S. 645, 657 (1995) (quoting 120 Cong. Rec. 29197 (1974)).

*Demars v. CIGNA Corp.,* 173 F.3d 443, 446 (1st Cir. 1999).

ERISA governs "employee benefit plans." 29 U.S.C. § 1003.  All "employee welfare benefit plans," such as group sickness or disability programs, are within the meaning of "employee benefit plan." 29 U.S.C. §§ 1002(1), (3).  The Act defines an "employee welfare benefit plan" for purposes of ERISA governance as being:

> any plan, fund, or program . . . established or maintained by an employer or by an employee organization . . . for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or

> otherwise, . . . benefits in the event of sickness, accident, disability,
> death or unemployment . . . .

*Id.* § 1002(1). Therefore, in order for an employee plan to be governed by ERISA, there must be (1) a plan, fund, or program (2) established or maintained (3) by an employer or an employee organization (4) for the purpose of providing "benefits in the event of sickness, accident, disability, death or unemployment" (5) to plan participants and their designated beneficiaries. *See*, *e.g.*, *Anderson v. UNUM Provident Corp.*, 369 F.3d 1257, 1263 (11th Cir. 2004); *Glass v. United of Omaha Life Insurance Co.*, 33 F.3d 1341, 1345 (11th Cir. 1994); *Donovan v. Dillingham*, 688 F.2d 1367, 1371 (11th Cir. 1982) (*en banc*).

### 2.    Is the disability benefits plan subject to ERISA?

Before diving into the complex analysis involved in determining whether an employee benefits plan is governed by ERISA, "courts usually begin by examining whether the plan falls into the regulatory safe harbor, which excludes from ERISA's jurisdictional ambit certain group or group-type insurance programs offered by an insurer to employees or members of an employee organization." *Anderson*, 369 F.3d at 1263 n.2. Assuming this so-called "safe harbor" provision applies, ERISA does not; consequently, state law claims ordinarily preempted by the Act would remain

8

viable.  *Id.* at 1262.

> **a.    Does the disability benefits plan fall within the regulatory "safe harbor"?**

The safe harbor regulation provides as follows:

> For purposes of title I of the Act and this chapter, the terms "employee welfare benefit plan" and "welfare plan" shall not include a group or group-type insurance program offered by an insurer to employees or members of an employee organization, under which
>
> (1)  No contributions are made by an employer or employee organization;
>
> (2)  Participation [in] the program is completely voluntary for employees or members;
>
> (3)  The sole functions of the employer or employee organization with respect to the program are, *without endorsing the program*, to permit the insurer to publicize the program to employees or members, to collect premiums through payroll deductions or dues checkoffs and to remit them to the insurer; and
>
> (4)  The employer or employee organization receives no consideration in the form of cash or otherwise in connection with the program, other than reasonable compensation, excluding any profit, for administrative services actually rendered in connection with payroll deductions or dues checkoffs.

29 C.F.R. § 2510.3-1(j) (emphasis supplied).

In keeping with the accepted practice, the court will first consider whether this "safe harbor" provision applies.  If it does not, then the court will be obligated to

9

examine the other prerequisites for qualification as an ERISA benefits plan.  *See Anderson*, 369 F.3d at 1263 n.2 (noting that "a plan that falls outside of the safe harbor exception does not necessarily fall within the jurisdiction of ERISA").

At the outset, it is notable that the "failure to meet *even one of the factors* [listed in 29 C.F.R. § 2510.3-1(j)] will keep a plan out of the statutory safe harbor . . .." *Shipley v. Provident Life & Accident Insurance Co.*, 352 F. Supp. 2d 1213, 1216 (S.D. Ala. 2004) (emphasis supplied); *see also Gahn v. Allstate Life Insurance Co.*, 926 F.2d 1449, 1452 (5th Cir. 1991) ("The group insurance plan must meet all four criteria in order to be exempt from ERISA."*); Memorial Hospital System v. Northbrook Life Insurance Co.*, 904 F.2d 236, 241 n.6 (5th Cir. 1990) ("The 'and' connector indicates that the existence of any one of the four criteria listed in the regulation would prevent a group insurance plan, otherwise qualifying as an ERISA plan, from being excluded from coverage under the Act.").

This is critical because defendants' only contention that the plan does not fall within the safe harbor provision is that plaintiff has failed to demonstrate that the third prong of the regulation is satisfied.[16]  Plaintiff, for her part, does not adequately address the four prongs of the safe harbor exception, but she does clearly oppose

---

[16] Doc. no. 19, at 9-18.

10

defendants' position.  Plaintiff, citing the affidavit of Paul Hubbert (Executive Secretary of the AEA), claims that the "AEA did not maintain, establish, administer, contribute funds, or claims process, related to insurance policies"[17]  Instead, according to plaintiff, the "AEA merely advertised plans to members via website and publications."[18]  Defendants vehemently contend that the AEA "did much more than merely publicize th[e] Plan."[19]  Indeed, defendants claim that it clearly "endorsed" the plan.  Such endorsement, according to defendants, defeats plaintiff's safe harbor argument.  *See* 29 C.F.R. § 2510.3-1(j)(3) (providing for safe harbor only if the employer or employee organization did not "endorse" the plan).

The court must now determine whether the AEA endorsed the benefits plan at issue.  At the outset, the court notes that the Eleventh Circuit requires "a low threshold for disqualification under the safe harbor exception."  *Moorman v. UnumProvident Corp.*, 464 F.3d 1260, 1268 (11th Cir. 2006).  That "low threshold" standard is particularly applicable when courts are determining whether an employer or employee organization has endorsed a plan.  According to the Department of Labor and the *Moorman* court:

---

[17] Doc. no. 14, at 18 (citing Affidavit of Paul Hubbert, ¶ 6).

[18] *Id.*

[19] Doc. no. 19, at 13.

>An employee organization will be considered to have endorsed a group or group-type insurance program if the employee organization expresses to its members any positive, normative judgment regarding the program.  An employee organization, may, in the course of permitting an insurer, insurance agent, or insurance broker to market the group or group-type insurance program to its employees or members, facilitate the publicizing and marketing of the program, but only to an extent short of endorsing the program.  An endorsement within the meaning of [§] 2510.3-1(j) occurs if the employee organization urges or encourages member participation in the program or engages in activities that would lead a member reasonably to conclude that the program is part of a benefit arrangement established or maintained by the employee organization.

*Moorman*, 464 F.3d at 1267 (11th Cir. 2006) (quoting ERISA Op. Letter No. 94-26A, 1994 WL 369282 (July 11, 1994)) (emphasis omitted).  "The regulation explicitly obliges the [employer or employee organization] . . . to refrain from *any* functions other than permitting the insurer to publicize the program and collecting premiums." *Butero,* 174 F.3d at 1213 (emphasis in original).

The evidence presented by defendants strongly indicates that the AEA does more than simply advertise the benefits plan at issue.  Defendants partially rely upon the testimony of American United's former Director of Group Underwriting, Stephen Bankson, an individual with "personal knowledge of the negotiations between [American United], Collateral Benefits, Inc., and the Alabama Education

Association."[20]  According to Mr. Bankson, the AEA was responsible for selecting certain terms of the benefits plan at issue, including:  the definition of eligible classes of participation; the definition of a "full time" employee; the maximum monthly benefit; the requisite waiting period; and the maximum monthly benefit duration.[21] Mr. Bankson's testimony further indicates that the AEA periodically reviewed the plan and negotiated modifications to coverage directly with the insurer.[22]  Moreover, the AEA has actually used the word "endorsed" when referring to American United's group disability policies.  Defendants cite myriad examples of this practice, but the court finds a memorandum written by Paul Hubbert — the very same individual plaintiff relies upon in her conclusory argument that the plan is within the safe harbor regulation — most telling.  When the AEA elected to replace its previous disability insurance carrier with American United, Mr. Hubbert circulated a memorandum letter to school superintendents and payroll officers.  Therein, he stated:

> We are pleased to announce that [American United] is the new underwriter for *the AEA Endorsed Disability and Life Insurance Program* . . . .  At completion of the [former insurer] replacement, *only the AEA endorsed programs will be available* through the AEA payroll deduction slot . . . . *The new policy gives excellent, affordable long-term*

---

[20] *See* doc. no. 19, at 14; *see also* Affidavit of Stephen Bankson, ¶ 1.

[21] Bankson Affidavit, ¶ 7; *see also* Bankson Affidavit, Exhibit B; doc. no. 19, at 14.

[22] Bankson Affidavit, ¶ 9; *see also* Bankson Affidavit, Exhibit C.

*salary protection without the expensive short-term items*, *which drive up*
*the cost . . . . The new AEA endorsed product* is designed for this
purpose, and with the intent of longterm product and rate stability.  *I*
*encourage you to help your employees by working with the Collateral*
*Benefits sales personnel in arranging for an open enrollment period in*
*your system*.[23]

Under relevant caselaw, the AEA's level of participation is more than sufficient

to bring the disability policy outside the safe harbor regulation.  In *Shipley v.*

*Provident Life & Accident Insurance Co.*, 352 F. Supp. 2d 1213 (S.D. Ala. 2004), for

example, another court in this Circuit confronted a similar situation and held that the

safe harbor was barred.  The plaintiff there conceded that the primary, long-term

disability-policy offered through her employer was subject to ERISA, but contended

that the supplemental or optional disability policy fell within the safe harbor

regulation.  *Id.* at 1215.  One issue was whether the employer's conduct satisfied the

endorsement prong.  *See id.*  After reviewing the evidence, the court noted that the

employer "was involved in the selection of the terms of the policies," and "had

interaction with [the insurer] concerning policy premiums, coverages, changes and

other aspects central to the maintenance of the . . . plan."  *Id.*  In light of these factors,

the court in *Shipley* held that the employer had been more active than the "safe

---

[23] Doc. no. 19, Exhibit 1, at 1-2 (Memorandum from Paul R. Hubbert to Superintendents and
Payroll Officers Entitled "AUL to Replace UNUM as Endorsed Provider") (emphasis supplied).

harbor" permits.  *See id.*

The Eleventh Circuit has also confronted a similar set of facts.  In *Butero v. Royal Maccabees Life Insurance Co.*, 174 F.3d 1207 (11th Cir. 1999), the court explained its reasoning in rejecting a claim that the safe harbor applied by noting that the regulation prohibits an employer or employee organization from engaging in "any functions other than permitting the insurer to publicize the program and collecting premiums."  *Id.* at 1213-14 (emphasis omitted).  After reviewing the evidence, the court noted:

> Simply Fashion [the employer] did a lot more.  It picked the insurer; it decided on key terms, such as portability and the amount of coverage; it deemed certain employees ineligible to participate; it incorporated the policy terms into the self-described summary plan description for its cafeteria plan; and it retained the power to alter compensation reduction for tax purposes.  So the safe harbor is barred.

*Id.* at 1213-14 (footnote omitted).

The present action is comparable in many respects to *Butero* and *Shipley*. Specifically, the court finds that defendants have adduced sufficient evidence that the AEA was involved in selecting the insurer, determining key terms of the disability policy, including member eligibility and monthly benefits, and negotiating further modifications to the plan.  Thus, the court concludes that the endorsement element

15

is not met — *i.e.*, the AEA "endorsed" the plan at issue.  Accordingly, "safe harbor" is not available.  *See id.* at 1214; *Shipley*, 352 F. Supp. 2d at 1216.

###### b.    Does the disability benefit plan otherwise qualify as an ERISA benefit plan?

Having concluded that "safe harbor" is out of reach, the court now must turn to "the high-seas definition of an 'employee welfare benefit plan' to see if the [disability] insurance policy here qualifies." *Butero*, 174 F.3d at 1214.  As explained above, in order for a benefits plan to be governed by ERISA, there must be (1) a plan, fund, or program (2) established or maintained (3) by an employer or by *an employee organization* (4) for the purpose of providing benefits (5) to plan participants or their designated beneficiaries.  *See, e.g., Anderson*, 369 F.3d at 1263.  It is indisputable that the AEA was not plaintiff's employer.  Thus, in order for the plan at issue to be subject to ERISA, the AEA must be an "employee organization." *See id.*  There is no dispute that, through her employment with the Cullman County Board of Education, plaintiff, as a member of the AEA, belonged to an organization that exists for the purpose of supporting employees.  The issue, however, is whether the AEA is an "employee organization" for the purposes of ERISA.

According to 29 U.S.C. § 1002, an employee organization is

16

> [A]ny labor union or any organization of any kind, or any agency or
> employee representation committee, association, group, or plan, in
> which employees participate and which exists for the purpose, in whole
> or in part, of dealing with employers concerning an employee benefit
> plan, or other matters incidental to employment relationships; or any
> employees' beneficiary association organized for the purpose in whole
> or in part, of establishing such a plan.

29 U.S.C. § 1002(4). Upon careful review, the statute presents two ways in which the AEA can be considered an employee organization: (1) it either "exists for the purpose, in whole or in part, of dealing with employers concerning an employee benefit plan, or other matters incidental to employment relationships," or (2) it is an "employees' beneficiary association organized for the purpose in whole or in part, of establishing such a plan." *Id.* The parties refer to the former, somewhat confusingly, as an "employee organization," and the latter as an "employees' beneficiary association."[24] For the sake of clarity, the court will do the same. Although the focus of plaintiff's argument is that the AEA cannot be considered an employees' beneficiary association, the court need not reach plaintiff's argument if the AEA clearly falls within the meaning of the definition set forth in the "employee organization" prong above.

Thus, the court will first consider whether the AEA is an employee

---

[24] *See* doc. no. 14, at 7, 12; doc. no. 19, at 2-3.

organization, *i.e.*, whether it "exists for the purpose, in whole or in part, of dealing with employers concerning an employee benefit plan, *or other matters incidental to employment relationships.*"   *Id.* (emphasis supplied).   One of the AEA's stated "strategic objectives" is "to protect, improve and expand the rights of education employees."[25]   Moreover, one of the AEA's stated goals is representing "members in their employment relations with their employers."[26]   Indeed, the AEA regularly does just that, as is evident from even  a cursory review of  Alabama caselaw.  *See*, *e.g.*, *Madison Board of Education v. Wilson*, 984 So. 2d 1153 (Ala. 2006) (lawyer for AEA filed brief in support of teacher appealing a hearing officer's determination under the Teacher Tenure Act); *Richardson v. Terry*, 893 So. 2d 277 (Ala. 2004) (AEA lawyer representing tenured teachers challenging transfers and nontenured teachers challenging nonrenewal of their contracts); *Ex parte Jackson*, 881 So. 2d 450 (Ala. 2003) (AEA filed brief in support of elementary school teacher challenging her termination).  Based upon the AEA's own stated goals and its willingness to carry out those goals, it is evident that the AEA's purpose, at least in part, involves dealing with employers concerning matters incidental to employment relationships.  Thus, the

---

[25] Doc. no. 15, Exhibit B, at 1-2.
[26] Doc. no. 15, Exhibit D, at 3.

court finds that the AEA qualifies as an employee organization under 29 U.S.C. § 1002(4).

That conclusion is bolstered by the decision reached in *Abston v. The Murfee Group*, No. 06-00482-KD-B (S.D. Ala. June 4, 2010), a case that squarely addressed the issue of whether the AEA is an employee organization for the purposes of ERISA.[27]  The court in *Abston* held that "the AEA clearly fits into ERISA's statutory definition of an employee organization."  *Id.* at *8.  Its ruling was based primarily upon the following determinations:

> One of AEA's strategic objectives is "to protect, improve, and expand the rights of education employees and to advocate political and legal action to gain greater professional, personal, and economic security."  The AEA lists various "insurance and related programs" as "tangible benefits of AEA membership" . . . . [T]he AEA . . . established the plan [and] the eligibility criteria of the plan, effective date, enrollment waiting period for new employees, payroll deduction frequency, and other significant terms of the contract.

*Id.* at *7-8 (citations omitted).  The court in *Abston* discussed a memorandum distributed by AEA Executive Paul Hubbert — a copy of which also was submitted as evidence by defendants in this case, as more fully explained above — informing school superintendents and payroll officers that the AEA endorsed American United's

---

[27] *See* doc. no. 1,  Exhibit C (*Abston v. The Murfee Group*, No. 06-00482-KD-B (S.D. Ala. June 4, 2010)).

Disability Insurance Program.  *Id.* at *7.  Based upon the memorandum, the court in *Abston* concluded that "[i]t is . . . clear that the AEA 'deal[s] with employers concerning' the plan."  *Id.*  Defendants have adduced sufficient evidence to convince this court that the present action is substantially similar, if not identical, to *Abston*. Although not binding, the court is persuaded by its holding.  For that reason, and for the reasons already stated, the court concludes that the AEA is an "employee organization" within the meaning of 29 U.S.C. § 1002(4).  A discussion of whether the AEA is an "employees' beneficiary association" is, therefore, unnecessary.

In short, the disability benefits plan at issue does not fall within the regulatory safe harbor provision, and the AEA is an "employee organization" for the purposes of ERISA.  Accordingly, the plan is governed by ERISA.  Having disposed of plaintiff's contentions otherwise, and for the reasons stated in the following section, the court concludes that defendants have met their burden of establishing subject matter jurisdiction.  Removal was, therefore, proper, and plaintiff's motion to remand is due to be denied.

**B.**   **Defendants' Motions to Dismiss Plaintiff's State Law Claims, Claims for Punitive and Extracontractual Damages, and to Strike Plaintiff's Demand for Jury Trial**

Important consequences flow from the court's conclusion that the disability

20

benefit plan is governed by ERISA.   Most notably, as outlined at the outset of this memorandum opinion, ERISA broadly preempts state law.  *E.g.*, *Hardy v. Welch*, 135 F. Supp. 2d 1171, 1177 (M.D. Ala. 2000).  The courts have identified two distinct ways in which this may occur.  *Id.* at 1178 ("Preemption based on ERISA may take one of two forms.").  The first, and only relevant, form of ERISA preemption, known as "complete" or "super" preemption,[28] "arises from Congress's creation of a comprehensive remedial scheme in 29 U.S.C. § 1132 for loss or denial of employee benefits."  *Butero*, 174 F.3d at 1211 (citing *Taylor*, 481 U.S. at 63-64).   The fundamental principal is that, "[w]hen Congress comprehensively occupies a field of law, 'any civil complaint raising this select group of claims is necessarily federal in character' and thus furnishes subject-matter jurisdiction under 28 U.S.C. § 1331."  *Id.* at 1211-1212 (quoting *Taylor*, 481 U.S. at 63-64).  In complete preemption cases,

---

[28] The other form of preemption is referred to as "defensive" preemption.  *See*, *e.g.*, *Cotton v. Mass. Mut. Life Ins. Co.*, 402 F.3d 1267, 1281 (11th Cir. 2005); *Butero*, 174 F.3d at 1212. Defensive preemption is derived from ERISA's explicit preemption provision, 29 U.S.C. § 1144(a). *Cotton*, 402 F.3d at 1281.  Section 1144(a) states that ERISA provisions "shall supersede any and all State laws insofar as they may now or hereafter relate to any [ERISA-governed] employee benefit plan."  29 U.S.C. § 1144(a).  The effect of defensive preemption is to "provide[] . . . an affirmative defense to certain state-law claims."  *Hardy*, 135 F. Supp. 2d at 1178.  As such, "defensive preemption does not furnish federal subject matter jurisdiction under 28 U.S.C. § 1331 . . . .  On the other hand, defensive preemption does require dismissal of state-law claims."  *Butero*, 174 F.3d at 1212; *see also Ervast*, 346 F.3d at 1014 ("The defensive preemption issue . . . is substantive; therefore, either in state or federal court, when a state law claim is brought, the defendant may raise the defense that the claims are preempted by ERISA under § 1144, and should be dismissed.").

state law claims are technically not dismissed, but are "recharacterize[d] . . . into a

federal claim under § 1132."  *Ervast v. Flexible Product Co.*, 346 F.3d 1007, 1014

(11th Cir. 2003) (emphasis omitted).

There is complete preemption under ERISA when four elements are satisfied.

*Butero*, 174 F.3d at 1212.

> First, there must be a relevant ERISA plan.  Second, the plaintiff must
> have standing to sue under that plan.  Third, the defendant must be an
> ERISA entity.  Finally, the complaint must seek compensatory relief
> akin to that available under § 1132(a); often this will be a claim for
> benefits due under a plan.

*Id.* (internal citations omitted).

In this case, it is not necessary to discuss the second, third, or fourth elements

because plaintiff, in her various motions and replies, challenges only the first element.

Since this court has already concluded that the disability plan at issue is governed by

ERISA, it is clear that the first element is met.  *Id.* at 1215 (noting that finding "that

the insurance policy was part of an 'employee welfare benefit plan' governed by

ERISA . . . means that we have a relevant ERISA plan").  Further, plaintiff does not

contest defendants' arguments that *all of her* claims "relate to" to the benefits plan.

*See* 29 U.S.C. § 1144(a) (providing that ERISA preempts "any and all State laws

insofar as they . . . relate to any employee benefit plan"); *Butero*, 174 F.3d at 1212,

22

1215 (noting that "ERISA's express preemption provision" will "defeat[] claims that seek relief under state-law causes of action that 'relate to' an ERISA plan"). Therefore, plaintiff's state law claims are due to be "recharacterize[d] . . . into a federal claim under [29 U.S.C.] § 1132."   *Ervast*, 346 F.3d at 1014 ("Super preemption . . . *recharacterizes* the state law claim into a federal claim under § 1132, so long as the other three *Butero* elements are present.") (emphasis in original).

Plaintiff offers no argument opposing defendants' motions to strike her demand for a jury trial, as well as her claims for punitive and extracontractual damages, and for good reason.   Plaintiff's claims for extracontractual damages and punitive damages are due to be dismissed because such damages are not recoverable under ERISA.   *See*, *e.g.*, *Godfrey v. Bellsouth Telecommunications, Inc.*, 89 F.3d 755, 761 (11th Cir. 1996) ("In *Bishop v. Osborn Transportation, Inc.*, 838 F.2d 1173 (11th Cir. 1988) . . . , this Court held that ERISA . . . do[es]  not provide for extra-contractual or punitive damages . . . .   [A] plan beneficiary can sue to enforce her rights under the plan and under ERISA, and for equitable relief, but not for punitive or compensatory damages."); *McRae v. Seafarers' Welfare Plan*, 920 F.2d 819, 822-23 (11th Cir. 1991) ("We hold that extra-contractual damages are not available under ERISA . . . .") (footnote omitted).

23

Furthermore, the Eleventh Circuit has routinely held that plaintiffs are not entitled to a jury trial pursuant to the provisions of ERISA.  *See*, *e.g*, *Stewart v. KHD Deutz of America Corp.*, 75 F.3d 1522, 1527 (11th Cir. 1996) ("For purposes of Seventh Amendment analysis, ERISA has been interpreted as an equitable statute. Accordingly, no Seventh Amendment right to a jury trial exists in actions brought pursuant to ERISA.") (citations omitted); *Blake v. Unionmutual Stock Life Insurance Company of America*, 906 F.2d 1525, 1526 (11th Cir. 1990) (holding that beneficiaries were not entitled to a jury trial on their ERISA claim for benefits under group health policy); *see also Frados v. Continental Casualty Company*, 363 F. Supp. 2d 1349, 1355 (S.D. Fla. 2005) (holding that "Plaintiff ha[d] no recourse to a jury under ERISA or the Seventh Amendment"); *East v. B.L. Long*, 785 F. Supp. 941, 942 (N.D. Ala. 1992) (noting that, despite the judge's leanings otherwise,"th[e] court [was] bound to follow the current holding of the Eleventh Circuit that plaintiffs in ERISA cases in federal court are not entitled to trial by jury").

In light of the foregoing, defendants' motions to dismiss plaintiff's state law claims, claims for punitive and extracontractual damages, and to strike her demand for a jury trial are due to be granted in part and denied in part.  The state law claims asserted by plaintiff against defendants are not technically "dismissed."  Instead, they

24

are converted to a federal ERISA claim under 29 U.S.C. § 1132.  However, defendants' motions to dismiss plaintiff's claims for extracontractual and punitive damages, and to strike her demand for a jury trial, are due to be granted.  Perhaps in anticipation of the inevitable, plaintiff states that, "in the event the Court were to hold that the contracts were ERISA plans, then Plaintiff requests this Court to . . . allow Plaintiff leave to amend to her complaint to more properly plead an ERISA action."[29] The court notes that plaintiff's complaint is extraordinarily detailed and was drafted with an abundance of care and precision.  Finding no reason to conclude otherwise, *see Spanish Broadcasting System of Florida, Inc. v. Clear Channel Communications, Inc.*, 376 F.3d 1065, 1077 (11th Cir. 2004) ("[L]eave to amend must be granted absent a specific, significant reason for denial."), plaintiff will be permitted to replead her complaint as one sounding in ERISA.  However, plaintiff must do so no later than twenty-one days from the entry of the order accompanying this memorandum opinion. Defendants must file their respective answers within ten days of plaintiff's filing of her amended complaint.

**C.     Defendants' Motions to Compel Arbitration**

      **1.      Overview of the FAA and the arbitration agreement**

---

[29] Doc. no. 14, at 20.

Under the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* ("FAA"), a written

agreement to arbitrate in a contract evidencing a transaction involving interstate

commerce is "valid, irrevocable, and enforceable, save upon such grounds as exist at

law or in equity for the revocation of any contract."[30]  9 U.S.C. § 2.  "The FAA

thereby places arbitration agreements on an equal footing with other contracts, and

requires courts to enforce them according to their terms."  *Rent-A-Center, West, Inc.*

*v. Jackson*, — U.S. —, 130 S. Ct. 2772, 2776 (2010) (internal citations omitted).

"Like other contracts, however, [arbitration agreements] may be invalidated by

'generally applicable contract defenses, such as fraud, duress, or unconscionability.'"

*Id.* (quoting *Doctor's Associates, Inc. v. Casarotto*, 517 U.S. 681, 687 (1996)).  State

law generally governs whether an enforceable agreement to arbitrate exists.  *See*

*Perry v. Thomas*, 482 U.S. 483, 492 n.9 (1987); *Caley v. Gulfstream Aerospace*

*Corp.*, 428 F.3d 1359, 1367-68 (11th Cir. 2005).  The "'federal policy favoring

arbitration, however, is taken into consideration even in applying ordinary state law.'"

---

[30] The court notes that prior to the Supreme Court's decisions in *Shearson/Am. Express, Inc. v. McMahon*, 482 U.S. 220 (1987) and *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477 (1989), there was some disagreement among the circuits regarding whether ERISA claims were arbitrable.  *See, e.g., Barrowclough v. Kidder, Peabody & Co.*, 752 F.2d 923 (3d Cir. 1985) *overruled by Pritzker v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 7 F.3d 1110 (3d Cir. 1993); *Bird v. Shearson Lehman/Am. Express, Inc.*, 871 F.2d 292 (2d Cir. 1989) *vacated by Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477 (1989), and *Arnulfo P. Sulit, Inc. v. Dean Witter Reynolds, Inc.*, 847 F.2d 475 (8th Cir. 1988).  After *McMahon* and *Quijas*, however, the courts have uniformly held that ERISA claims are arbitrable.

26

*Id.* at 1368 (quoting *Cooper v. MRM Investment Co.*, 367 F.3d 493, 498 (6th Cir.2004)) (internal quotation marks omitted).

"[I]n order for the FAA to govern an [arbitration] agreement, (1) there must be a written agreement calling for arbitration and (2) the contract in which the arbitration agreement appears must relate to a transaction involving interstate commerce." *Prudential Securities v. Micro-Fab, Inc.*, 689 So. 2d 829, 832 (Ala. 1997) (citing *Maxus, Inc. v. Sciacca*, 598 So. 2d 1376 (Ala. 1992)).

The parties do not dispute that the two elements above are met in the present action.[31]  Plaintiff executed a written arbitration agreement in connection with her enrollment in American United's benefit plan.  Therein, she acknowledged receipt of the "Alabama Arbitration Disclosure Notice," which provides as follows:

1.    The policy for which you have applied includes a binding arbitration agreement.

2.    The arbitration agreement requires that any disagreement related to this policy must be solved by arbitration and not in a court of law.

---

[31] In their motion to compel arbitration, defendants assert that "although Defendants DRMS and Collateral Benefits Group, LLC are not direct signatories to the subject policies, the claims asserted by Plaintiff against them are also subject to arbitration [because] a non-signatory may compel arbitration under the doctrine of equitable estoppel." Doc. no. 18, at 4; *see also* doc. no. 20, at 9.  Plaintiff offers no law or argument to counter defendants' position.  Therefore, the court will consider the matter undisputed.

3.      The results of the arbitration are final and binding on you and the insurance company.

4.      In an arbitration, an arbitrator, who is an independent, neutral party, gives a decision after hearing the position of the parties.

5.      When you accept this insurance policy, you agree to resolve any disagreement related to the policy by binding arbitration instead of a trial in court including a trial by jury.

6.      Arbitration takes the place of resolving disputes by a judge and jury and the decision of the arbitrator cannot be reviewed in court by a judge and jury.[32]

According to the arbitration agreement signed by plaintiff, "[a]ny controversy or claim arising out of or relating to the policy, or the breach thereof, shall be settled by arbitration in accordance with the rules of the American Arbitration Association."[33]

## 2.      Whether defendants' waived their right to arbitrate

Plaintiff opposes defendants' motions to compel arbitration on two grounds. She first argues that defendants have waived their right to arbitration.  Although state law often governs in determining whether a valid arbitration contract exists, *see*, *e.g.*, *Perry v. Thomas*, 482 U.S. 483, 492 n.9 (1987), "waiver is a question of federal, not state, law."  *Goff Group, Inc. v. Greenwich Insurance Co.*, 231 F. Supp. 2d 1147,

---

[32] Doc. no. 18, Exhibit 1(A) (Plan Enrollment Form Executed by Plaintiff).

[33] *E.g.*, doc. no. 18, Exhibit 1(B), at 19.

28

1155 ( M.D. Ala. 2002) (citations omitted); *see also S & H Contractors, Inc. v. A.J. Taft Coal Co.*, 906 F.2d 1507, 1514 (11th Cir. 1990) ("Our determination of whether [plaintiff] waived its right to arbitration, as opposed to whether the contract is void under Alabama law, is controlled solely by federal law.").  Under federal law, "[a] party has waived its right to arbitrate if, under the totality of the circumstances, [1] the party has acted inconsistently with the arbitration right, and, [2] in so acting, has in some way prejudiced the other party."  *S & H Contractors*, 906 F.2d at 1514 (citations and internal quotation marks omitted) (bracketed alterations added).

Plaintiff provides several bases upon which she argues that defendants have acted inconsistently with their right to arbitration.  In sum, she asserts that defendants waived arbitration by removing the case to this court and further "participating in several rounds of motion practice."[34]  She also argues that she has been prejudiced by the expenses incurred by responding to the motions and briefs filed by defendants in this action.[35]  Plaintiff's counsel claims that he has spent over "thirty hours of his time in this litigation responding to the Defendants' removal of the case and Defendants' motions to dismiss . . . ."[36]

---

[34] Doc. no. 21, at 7.

[35] *Id.* at 8-9.

[36] *Id.* at 8.

29

The court finds plaintiff's arguments unconvincing.  Defendants' removal of plaintiff's case to this court is insufficient grounds to establish that they have acted inconsistently with the right to arbitrate.  *See Goff Group*, 231 F. Supp. 2d at 1155 (M.D. Ala. 2002) ("[T]his court refuses to find that removal of a case to federal court, standing alone, constitutes waiver of a party's right to compel arbitration."); *see also Baker v. Conoco Pipeline Co.*, 280 F. Supp. 2d 1285, 1299 (N.D. Okla. 2003) (finding that defendant's removal of action from state court to federal court prior to filing motion to stay proceedings and for order compelling arbitration was not inconsistent with its right to arbitrate); *Cason v. Conoco Pipeline Co.*, 280 F. Supp. 2d 1309, 1321 (N.D. Okla. 2003) (same).

Moreover, numerous cases in this circuit have held that a defendant's filing of a motion to dismiss does not waive their right to arbitration.  *See*, *e.g.*, *Wilson v. par Builders II, Inc.*, 879 F. Supp. 1187, 1189 (M.D. Fla. 1995) ("The Court does not find the defendants' testing of the viability of the complaint, by way of motion to dismiss, to be inconsistent with invoking the right to arbitration."); *Smith v. Pay-Fone Systems, Inc.*, 627 F. Supp. 121, 125 (N.D. Ga. 1985) (holding that defendants did not waive their right to arbitrate by filing motion to dismiss); *Manard v. Knology, Inc.*, No. 4:10-CV-15, 2010 WL 2528320, at *4 (M.D. Ga. June 18, 2010) (same).

30

The court also notes that defendants expressly stated on the first page of their Notice of Removal — the first document filed with this court — that "Defendants file this Notice of Removal without waiving, and specifically reserving, the right to arbitrate any claims covered by any arbitration provision contained in the policies at issue."[37]  In light of this statement and the above-cited authority, the court concludes that defendants have not acted inconsistently with their right to arbitration.  Having reached this conclusion, it is unnecessary for the court to discuss whether plaintiff was prejudiced by defendants' actions.[38]  *See S & H Contractors*, 906 F.2d at 1514 ("A party has waived its right to arbitrate if . . . the party has acted inconsistently with the arbitration right, *and, in so acting*, has in some way prejudiced the other party.") (citations and internal quotation marks omitted) (emphasis supplied).

### 2.     Whether the arbitration clause covers plaintiff's claims against defendant Collateral Benefits

---

[37] Doc. no. 1, at 1.

[38] Even so, plaintiff can hardly argue that the expenses incurred by "several rounds of motion practice," doc. no. 21, at 7, prejudiced her when plaintiff filed several of the motions herself.  Indeed, plaintiff's motion to remand was likely responsible for the majority of expenses incurred thus far by all parties.  Moreover, plaintiff would have incurred comparable expenses had defendants immediately brought a motion to compel arbitration, as the same issues presented in defendants' motions — whether plaintiff's claims are preempted under ERISA — would have been addressed in the arbitration forum.  The court also notes that plaintiff's decision to allocate more time, and thereby willingly incur further expenses, by opposing defendants' motions to compel arbitration does not exactly lend credence to her position that she has been financially prejudiced by defendants' actions.

31

The only other ground upon which plaintiff opposes defendants' motions to compel arbitration rests upon the scope of the arbitration agreement.  As previously stated, the agreement encompasses "[a]ny controversy or claim *arising out of or relating to* the policy, or the breach thereof . . . ."[39]  In addition to the breach of contract and bad faith claims against defendants American United and DRMS, plaintiff asserts against defendant Collateral Benefits claims for negligent and/or wanton failure to procure insurance coverage; fraud and misrepresentation; suppression; and deceit.[40]  Plaintiff, who provides approximately one page of scant discussion, avers that the "claims against [Collateral Benefits] have nothing to do with Plaintiff's breach of contract and bad faith claims against [the other defendants]."[41]  Upon reviewing plaintiff's complaint, it is evident that all claims asserted against Collateral Benefits, the insurance agent who contacted plaintiff to procure the policy at issue, stem from Collateral Benefits' alleged failure, whether negligent or fraudulent, to inform plaintiff about the plan and procure for her adequate coverage.   Thus, plaintiff's claims against Collateral Benefits unquestionably "arise out of or relat[e] to" the sale of the insurance policy at issue.

---

[39] Doc. no. 18, Exhibit 1(B), at 19 (emphasis supplied).

[40] Doc. no. 1, Exhibit A.

[41] Doc. no. 21, at 12.

Moreover, under Alabama law, arbitration clauses employing phrases such as "arising out of" or "relating to" are to be construed as "broad" arbitration clauses carrying a presumption in favor of arbitration.  *See*, *e.g.*, *Reynolds and Reynolds Co., Inc. v. King Automobiles*, 689 So. 2d 1, 2-3 (Ala. 1996) (reaffirming the court's position that the terms "arising out of or relating to" are to be construed broadly) (citation and emphasis omitted).  The court further acknowledges that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 24-25 (1983).  Based upon the foregoing, the court must conclude that the broad language of the arbitration agreement covers plaintiff's claims against Collateral Benefits.

In summary, plaintiff executed a valid arbitration agreement that must be enforced in the spirit of the federal policy favoring arbitration.  Defendants have not waived their right to arbitrate, and the language of the arbitration agreement signed by plaintiff is broad enough to encompass all claims against all defendants.  As plaintiff presents no further argument on this issue, defendants' motions to compel arbitration and stay proceedings are due to be granted.

## IV.  CONCLUSION

An appropriate order, consistent with the foregoing memorandum opinion, will

be entered contemporaneously herewith.

DONE this 18th day of January, 2011.

United States District Judge

34